## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Elizabeth A. Pascal |
| | : | |
| v. | : | |
| | : | |
| MARCOS CESAR ACOSTA and | : | Mag. No. 26-7044 (EAP) |
| CARLOS H. CORDERO-GUTIERREZ | : | Mag. No. 26-7045 (EAP) |
| | : | |
| | : | **CRIMINAL COMPLAINT** |

I, Nicholas D. Jentz, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Drug Enforcement Administration, and that this complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

*/s/ Nicholas D. Jentz*
Nicholas D. Jentz
Special Agent
Drug Enforcement Administration

Attested to by telephone pursuant to
Fed. R. Crim. P. 4.1 on
April 29, 2026,
in the District of New Jersey

Hon. Elizabeth A. Pascal
United States Magistrate Judge

## ATTACHMENT A

### COUNT ONE
(Conspiracy to Distribute Controlled Substances)

From on or about February 1, 2026, and continuing to on or about April 28, 2026, in the District of New Jersey, and elsewhere, the defendants,

**MARCOS CESAR ACOSTA** and
**CARLOS H. CORDERO-GUTIERREZ,**

did knowingly and intentionally conspire with each other and others to distribute and possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance, contrary to Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A).

In violation of Title 21, United States Code, Section 846.

2

## ATTACHMENT B

I, Nicholas D. Jentz, am a Special Agent with the Drug Enforcement Administration. I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents, and items of evidence. Because this Affidavit is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where the contents of documents and the actions and statements of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

## BACKGROUND

1. Beginning in or around February 2026, law enforcement officers commenced an investigation of a California-based drug trafficking organization ("DTO") involved in the international and interstate transportation and distribution of narcotics. The investigation to date has revealed – through information from a historically reliable confidential source whose identity is known to law enforcement, recorded consensual communications between the confidential source and MARCOS CESAR ACOSTA ("ACOSTA"), physical and electronic surveillance, and other investigative techniques – that ACOSTA and CARLOS H. CORDERO-GUTIERREZ ("CORDERO-GUTIERREZ") (collectively, the "DEFENDANTS") are members of a conspiracy to distribute narcotics in New Jersey.

2. ACOSTA has been identified through this investigation as a principal member of the DTO. CORDERO-GUTIERREZ is a truck driver for ACOSTA's DTO. Law enforcement has information that ACOSTA is associated with the Sinaloa Cartel operating in Mexico.

3. A confidential source working at the direction and supervision of law enforcement officers ("CS-1") provided information that ACOSTA can obtain large quantities of narcotics from Mexico, including fentanyl and methamphetamine, to be delivered into the United States, and which can be further transported by ACOSTA's DTO to New Jersey.

4. The evidence described below demonstrates that the DEFENDANTS acted in concert to transport a large quantity of methamphetamine into New Jersey.

3

## THE FEBRUARY PILL DELIVERY

5.      In February 2026, CS-1 began communicating with two individuals ("Individual-1") and ("Individual-2") on WhatsApp[1] regarding the transportation of narcotics from California into New Jersey. Individual-1 is based in California and Individual-2 is based in Tijuana, Mexico. Individual-1 and Individual-2 agreed to send CS-1 10,000 fentanyl pills from California to a post office box in New Jersey (the "P.O. Box"). In return, CS-1 would send $12,000 via wire transfer to a bank account provided by Individual-1 and Individual-2.

6.      On or about February 28, 2026, a United States Postal Service package containing approximately 7,300 pills was delivered to the P.O. Box. Law enforcement officers field tested some of the pills, which returned a positive result for the presence of fentanyl.[2] Individual-1 and Individual-2 provided CS-1 with account information at a financial institution (the "Bank Account") where CS-1 was to wire the payment and, on or about March 6, 2026, $12,000 was wired to the Bank Account in exchange for the pills.

## THE APRIL 15, 2026 METHAMPHETAMINE DELIVERY

7.      Individual-2 introduced CS-1 to ACOSTA as someone who could obtain large quantities of narcotics. Beginning in April 2026, Individual-2 and ACOSTA communicated with CS-1 via WhatsApp to arrange for a sale of methamphetamine. As a preliminary purchase, Individual-2 and ACOSTA agreed to sell CS-1 approximately two pounds of methamphetamine in exchange for $3,000. Another confidential source working at the direction and supervision of law enforcement officers ("CS-2") agreed to meet ACOSTA to complete the transaction at a particular commercial establishment in New York City (the "Meeting Location").

8.      On or about April 15, 2026, prior to the transaction, law enforcement officers met with CS-2 at a predetermined briefing location, where they searched CS-2 for contraband, currency and weapons, which yielded negative results. Law enforcement also provided CS-2 with approximately $3,000 in cash to complete the controlled purchase with ACOSTA and a covert recording device to record the meeting.

---

[1] WhatsApp provides an Internet-based multimedia messaging service, WhatsApp Messenger, via a cross-platform smartphone application that enables users to communicate with each other via text, voice, and video. Users can also exchange recorded audio and video messages, photos and other files, and their location. The smartphone application can be paired with the WhatsApp Web or Desktop services to achieve similar functionality from other devices. Communication with other users over WhatsApp requires Internet access.

[2] Subsequent laboratory testing on a sample of four pills revealed the presence of acetaminophen but not fentanyl. Full results are pending.

4

9.      Law enforcement established surveillance at the Meeting Location. Prior to the meeting, law enforcement identified ACOSTA sitting inside the Meting Location with a dark colored backpack (the "Backpack"). CS-2 entered the Meeting Location and met with ACOSTA. During the meeting, ACOSTA provided CS-2 with the Backpack and, in exchange, CS-2 provided ACOSTA with the approximately $3,000 in cash that law enforcement had provided for the controlled purchase.

10.      CS-2 departed the Meeting Location and proceeded to a pre-determined debriefing location as instructed. There, law enforcement officers searched CS-2 for contraband, currency and weapons, which, other than the Backpack, yielded negative results. Law enforcement officers retrieved the Backpack and the covert recording device previously provided to CS-2. The Backpack that ACOSTA provided to CS-2 contained approximately two pounds of suspected methamphetamine. Law enforcement field tested the suspected methamphetamine, which returned a positive result for methamphetamine.

## THE APRIL 20, 2026 WAREHOUSE SCOUTING TRIP

11.      After the April 15, 2026 methamphetamine transaction, ACOSTA and CS-1 discussed the potential for a future, large delivery of methamphetamine. CS-1 informed ACOSTA that he/she had secured a warehouse in or around Sparta, New Jersy (the "Sparta Warehouse") that would be suitable to receive a large quantity of methamphetamine. ACOSTA arranged with CS-1 to visit the Sparta Warehouse to inspect its appropriateness for a methamphetamine shipment.

12.      On or about April 20, 2026, CS-1 and CS-2 accompanied ACOSTA for a visit to the Sparta Warehouse. Prior to the visit, law enforcement officers met with CS-1 and CS-2 at a predetermined briefing location, where they searched CS-1 and CS-2 for contraband, currency, and weapons, which yielded negative results. CS-2 was provided with a covert recording device to record the meeting.

13.      CS-2 picked up ACOSTA in New York City in his/her vehicle and drove to the Sparta Warehouse. CS-1 met ACOSTA and CS-2 at the Sparta Warehouse. At the Sparta Warehouse, ACOSTA informed CS-1 that he receives shipments of narcotics approximately every 10 to 15 days. Further, ACOSTA informed CS-1 that he was satisfied with the Sparta Warehouse as a potential location for future narcotics deliveries and expressed a desire to continue doing business, meaning narcotics trafficking, with CS-1 and CS-2.

14.      After the visit, CS-1 and CS-2 proceeded to a pre-determined debriefing location as instructed. There, law enforcement officers searched CS-1 and CS-2 for contraband, currency, and weapons, which yielded negative results. Law enforcement officers retrieved the recording device previously provided to CS-2.

## THE APRIL 28, 2026 METHAMPHETAMINE DELIVERY PLANNING

15. On or about April 27, 2026 at approximately 6:19 p.m., ACOSTA spoke with CS-1 via WhatsApp involving a proposed delivery of methamphetamine to New Jersey. ACOSTA informed CS-1 that the delivery would occur the next day, April 28, 2026. ACOSTA, whom CS-1 understood to be in North Carolina, discussed whether he would travel to New Jersey to coordinate the methamphetamine delivery by going "up" (meaning via air travel) or "down" (meaning driving). CS-1 informed ACOSTA that he needed an hour to confirm with his/her people "up north" (meaning Canada) to secure the money for the methamphetamine delivery. ACOSTA also asked CS-1 for $1,000 to help defray ACOSTA's travel costs.

16. During that conversation, ACOSTA told CS-1 that they were going to need a "big car" because the methamphetamine was arriving in two big boxes and one bag. ACOSTA informed CS-1 that he was coming with "everything," which he clarified to CS-1 as meaning 120 "whole." Based on my training and experience, and my knowledge of this case, 120 "whole" means 120 kilograms. ACOSTA also stated that he was coming with a "kid," later identified as CORDERO-GUTIERREZ, that "they" sent. Based on my training and experience and my knowledge of this case, I believe that "kid" referred to a co-conspirator to help facilitate the delivery of the methamphetamine and that "they" referred to the Mexican drug cartel that ACOSTA is associated with. ACOSTA asked CS-1 if he/she had a van, which CS-1 confirmed and sent ACOSTA a photograph of it. After receiving the photograph, ACOSTA asked CS-1 if he/she has a different vehicle because ACOSTA didn't want to "stand out."

17. At approximately 7:52 p.m., ACOSTA and CS-1 had another conversation via WhatsApp. By that time, CS-1 had sent ACOSTA $500 via wire transfer to assist with ACOSTA's travel to New Jersey. During their discussion, ACOSTA confirmed to CS-1 that he would be transporting to New Jersey 120 kilograms of methamphetamine. ACOSTA again informed CS-1 that a "kid" (later identified as CORDERO-GUTIERREZ) would be with him.

18. CS-1 proposed to ACOSTA that he/she would make arrangements for a hotel room (the "Hotel") on Tuesday after ACOSTA arrived in New Jersey so that they could complete the transaction on Wednesday. ACOSTA responded that "they" (meaning the Mexican drug cartel) would give him information about the delivery and that afterwards, ACOSTA would let CS-1 know about the delivery date. CS-1 told ACOSTA that his/her people (meaning the Canadians) would be arriving in the evening on April 28, 2026. ACOSTA responded that his people would also be arriving in the afternoon or evening on April 28, 2026.

19. At approximately 8:24 p.m., ACOSTA and CS-1 spoke again via WhatsApp. CS-1 informed ACOSTA that he/she would be prepared to make ACOSTA's requested $40,000 transportation fee payment upon delivery of the

methamphetamine. Payment for the methamphetamine itself would be provided by CS-1's Canadian contacts after the methamphetamine was delivered to them. CS-1 further stated that because the delivery location was in a business area, it would not look out of place for a truck to be parked or make a delivery.

20.     At approximately 8:51 p.m., ACOSTA and CS-1 spoke again via WhatsApp. ACOSTA informed CS-1 that he had been in communication with the individual transporting the methamphetamine and that this individual would be in contact with ACOSTA after he finished resting. Based on my training and experience and my knowledge of this case, I believe ACOSTA was referring to a truck driver. Further, ACOSTA confirmed with CS-1 that the truck transporting the methamphetamine (the "Truck") and ACOSTA's associates would arrive in the afternoon or evening on April 28, 2026. CS-1 responded that his/her people would be arriving at approximately the same time.

21.     At approximately 9:43 p.m., ACOSTA informed CS-1 that the methamphetamine could not be delivered to the Sparta Warehouse because the Truck was on a prearranged route that could not be detoured. ACOSTA presented a location in Swedesboro, New Jersey (the "Swedesboro Warehouse") as the new delivery location.

22.     At approximately 9:48 p.m., ACOSTA and CS-1 continued their conversation via WhatsApp regarding the methamphetamine delivery. CS-1 again informed ACOSTA that he/she would have the $40,000 transportation fee for ACOSTA upon delivery of the methamphetamine. CS-1 asked ACOSTA if they could divide the methamphetamine at the Swedesboro warehouse or another location. Acosta responded that they would need to divide it at another location, possibly at the Sparta Warehouse. ACOSTA told CS-1 that "they are whole" and from "every whole I have four left and so that I can separate them." Based on my training and experience and my knowledge of this case, ACOSTA was referring to kilograms and dividing them each into four components. CS-1 asked ACOSTA to confirm whether the methamphetamine would be delivered on April 28 or April 29, 2026. ACOSTA confirmed that the shipment would arrive on April 28, 2026. CS-1 then asked ACOSTA if he wanted to complete the transaction on April 28 or in the morning on April 29, 2026. ACOSTA stated that he would see CS-1 on April 28 to complete the transaction.

23.     At approximately 10:20 p.m., ACOSTA and CS-1 continued their conversation via WhatsApp regarding the methamphetamine delivery. ACOSTA instructed CS-1 not to mention prices for the methamphetamine "in front of the kid." CS-1 and ACOSTA reviewed the itinerary for the next day: CS-1 advised ACOSTA to arrive via Philadelphia Airport at around 2:00 p.m. so that he could arrive at the Hotel at around 3:00 p.m., and the two of them would wait for the Truck to arrive. ACOSTA informed CS-1 that the "kid" travels in the "apparatus," that he will be inside it, and they will pick him up. Based on my training and experience and

7

knowledge of this case, the "apparatus" refers to the Truck. CS-1 asked ACOSTA if the name that appeared on his/her caller ID—ACOSTA—was ACOSTA's real name, and ACOSTA confirmed that it was.

24.    On or about April 27, 2026, Individual-2 sent a message to CS-1 via WhatsApp stating that, "your stuff is coming tomorrow."

## THE APRIL 28, 2026 METHAMPHETAMINE DELIVERY

25.    ACOSTA arrived at Philadelphia Airport and traveled to the Hotel. CS-1 and CS-2 traveled to the Hotel to meet with ACOSTA to discuss the methamphetamine delivery scheduled for later that day.

26.    Prior to the meeting between CS-1 and ACOSTA, CS-1 and CS-2 met with law enforcement officers at a predetermined briefing location, where law enforcement searched CS-1 and CS-2 and the vehicle in which they arrived for contraband, currency, and weapons, which yielded negative results. CS-1 and CS-2 were provided with a covert recording device to record their meeting with ACOSTA.

27.    After CS-1 and CS-2 arrived at the Hotel, ACOSTA exited the Hotel and entered CS-1 and CS-2's vehicle. During a recorded conversation, ACOSTA discussed the logistics and details of the delivery, including the price that ACOSTA would charge per pound of methamphetamine, $1,700, of which $1,500 was for "them" and $200 for an individual in Mexico. ACOSTA further instructed CS-1 and CS-2 to pay the Truck driver, later identified as CORDERO-GUTIERREZ, the $40,000 transportation fee, which CORDERO-GUTIERREZ would take back to Mexico. ACOSTA again reminded CS-1 not to discuss methamphetamine pricing in front of CORDERO-GUTIERREZ. Finally, ACOSTA propositioned CS-1 and CS-2 to do more business together, meaning narcotics trafficking.

28.    ACOSTA exited the vehicle and returned to the Hotel. CS-1 and CS-2 departed the area.

29.    Ahead of the scheduled methamphetamine delivery, law enforcement officers established surveillance in the vicinity of the Swedesboro Warehouse. ACOSTA contacted CS-1, however, and informed him/her that CORDERO-GUTIERREZ had changed the delivery location to Pennsville Auburn Road in Penns Grove, New Jersey (the "Delivery Location") because CORDERO-GUTIERREZ felt more comfortable completing the transition there. Law enforcement established surveillance in the vicinity of the Delivery Location. Thereafter, under constant law enforcement surveillance, CS-2 returned to the Hotel, picked up ACOSTA, and drove him to the Delivery Location.

30.    When CS-2 and ACOSTA arrived at the Delivery Location, a tractor-trailer truck, later identified as the Truck, was already present. ACOSTA instructed

8

CS-2 to flash the vehicle's lights to signal the Truck that they had arrived. Afterwards, ACOSTA and CS-2 walked to the cab of the Truck to receive and inspect the methamphetamine. After confirming that the methamphetamine was in the Truck cab, CS-2 returned to his/her vehicle. CS-2 called CS-1 to confirm that the Truck had arrived with the methamphetamine.

31.   Shortly thereafter, law enforcement converged on the Delivery Location and approached the Truck cab. ACOSTA had exited the Truck cab and was attempting to walk away from it. Officers arrested ACOSTA. CORDERO-GUTIERREZ was inside the Truck cab and, after initially declining law enforcement's commands, exited the cab and was placed under arrest.

32.   Law enforcement utilized a specially trained narcotics detection dog (the "K-9") to conduct an open-air sniff of the exterior of the Truck. Law enforcement walked the K-9 near and around the exterior of the Truck, at which time the K-9 alerted law enforcement to the presence of narcotics inside the cab of the Truck.

33.   Law enforcement then conducted a search of the Truck cab and recovered three black storage boxes, one duffel bag, and one garbage bag. The three black storage boxes, the duffel bag, and the garbage bag each contained large quantities of suspected methamphetamine. Law enforcement transported the suspected methamphetamine to a secure location, where it was field tested and weighed. The field test returned a positive result for methamphetamine and the suspected methamphetamine weighed approximately 260 pounds (approximately 118 kilograms).

CONTENTS APPROVED

UNITED STATES ATTORNEY'S OFFICE

By:

Jonathan S. Garelick, AUSA

Date: April 29, 2026